Madelon HYSAW, Kathryn Hysaw Weafer, Michael and Cindy Burris Family Partnership III, Ltd., Byron M. Burris and Judith Ann Burris Dziuk, Petitioners,

v.

Bretton Guy DAWKINS, Bradley Ken Dawkins, Jerry Howard Oxford and Sharon Ann Oxford, Respondents

NO. 14–0984

Supreme Court of Texas.

Argued December 8, 2015

Opinion delivered: January 29, 2016

Thomas H. Crofts Jr., Crofts & Callaway, P.C., San Antonio, Robert C. McKay, McKay & Coffey, L.L.P., Victoria, Boyce C. Cabaniss, Mary A. Keeney, John B. McFarland, Graves, Dougherty, Hearon & Moody, P.C., Austin, Laura H. Burney, St. Mary's School of Law, San Antonio, for Petitioner.

Michael G. Maloney, Judith R. Blakeway, James Maverick McNeel, Strasburger & Price LLP, San Antonio, for Respondent.

**4**

J. Byron Burton III, Matthew Miles, Martin, Drought & Torres, P.C., San Antonio, Allen D. Cummings, Law Offices of Alan D. Cummings, San Antonio, Jeffrey R. Akins, Law Office of Jeffrey R. Atkins, San Antonio, for Amicus Curiae.

JUSTICE GUZMAN delivered the opinion of the Court.

Mineral deeds employing double fractions give rise to disputes about whether the instrument creates a fixed ("fractional") royalty or a floating ("fraction of") royalty. The double-fraction problem emerges when an instrument expresses a royalty interest as the product of two fractions, such as "1/2 of the usual 1/8." When viewed against a historical backdrop in which the standard royalty was 1/8 and many landowners erroneously believed the landowner's royalty could be no greater than 1/8, the quantum of the interest conveyed or reserved by double-fraction language is subject to disagreement. Questions arise about whether double fractions must be multiplied and the royalty interest fixed without regard to the royalty negotiated in a future mineral lease (fractional royalty) or whether 1/8 was intended as a synonym for the landowner's royalty, meaning the interest conveyed varies depending on the royalty actually obtained in a future mineral lease (fraction of royalty). The proper construction of instruments containing double-fraction language is a dilemma of increasing concern in the oil and gas industry, as uncertainty abounds, disputes proliferate, and courts have seemingly varied in their approaches to this complicated issue.

The case before us today presents the double-fraction issue in the context of a will-construction dispute. More than a half century ago, various real-property interests were distributed to three children under their mother's will. The testatrix bequeathed different-sized land tracts to each of her children in fee simple but globally devised to each child a non-participating royalty interest of "an undivided one-third (1/3) of an undivided one-eighth (1/8) of all oil, gas or other minerals in or under or that may be produced from any of said lands." The will similarly specified that each child "shall receive one-third of one-eighth royalty," unless there has been an *inter vivos* sale or conveyance of royalty on land willed to that child, in which case the children "shall each receive one-third of the remainder of the unsold royalty." Heirs of the original devisees are at odds over the proper construction of these will provisions and the quantum of royalty bequeathed to each sibling because some of the lands are now subject to mineral leases providing for royalties in excess of 1/8. The issue is whether the double-fraction language fixed the siblings' devised royalty at 1/24–allowing the fee owner the exclusive benefit of any negotiated royalty exceeding 1/8–or whether the testatrix intended the devisees to share equally in all future royalties.

In resolving this dispute, we hew to the guiding principle that our objective is to discern and give effect to the testatrix's intent as expressed in the will's four corners. We determine intent by construing the instrument holistically and by harmonizing any apparent conflicts or inconsistencies in the language. Though we acknowledge the call for more certain and predictable guidance, we reject bright-line rules of interpretation that are arbitrary and, thus, inimical to an intent-focused inquiry. *See Concord Oil Co. v. Pennzoil Expl. & Prod. Co.*, 966 S.W.2d 451, 460–61 (Tex.1998) (plurality op.); *see also Luckel v. White*, 819 S.W.2d 459, 464 (Tex.1991). We therefore cannot embrace a mechanical approach requiring rote multiplication of double fractions whenever they exist. Rather, considering the testatrix's will in

its entirety, we hold that she intended her children to share future royalties equally, bequeathing to each child a 1/3 floating royalty, not a 1/24 fixed royalty.

## I. Factual and Procedural Background

Ethel Nichols Hysaw executed her will in 1947, at which time she owned three tracts of land in Karnes County, Texas—a 1065–acre tract, a 200–acre tract, and a 150–acre tract. Her will divided the property among her three children in fee-simple title, as follows: to Inez Hysaw Foote, 600 acres from the 1065–acre tract; to Dorothy Francis Hysaw Burris, the remaining 465 acres of the 1065–acre tract; and to Howard Caldwell Hysaw, Jr., the 200–acre tract, which had been a gift to Ethel from her father, and the 150–acre tract, which was her homestead. With respect to the related mineral estates, Ethel[1] employed a different distribution method, burdening each tract as follows:

I will and bequeath to each of the above named children fee simple title to the lands designated to go to them, subject, however, to the following:

That *each of my children* shall have and hold an undivided *one-third (1/3) of an undivided one-eighth (1/8) of all oil, gas or other minerals in or under or that may be produced from any of said lands*, the same being a non-participating royalty interest;.... (Emphases added.)[2]

Ethel further described the royalty interest devised to each child in nearly identical paragraphs:

[T]hat is to say, that . . . [the named child] shall not participate in any of the bonus or rentals to keep any lease or leases in force; that it shall not be necessary for the said [named child] to execute any oil, gas or mineral lease over the lands of [the siblings], and that it shall not be necessary for [the named child] to obtain the consent either orally or written of the said [siblings], to lease any portion of said land so willed to [the named child] for oil, gas or other minerals, *but that the said [named child] shall receive one-third of one-eighth royalty, provided there is no royalty sold or conveyed by me covering the lands so willed to [the child]*, . . . . (Emphases added.)

Each paragraph concludes with a residual royalty clause that takes into account the effect of an *inter vivos* royalty sale on lands bequeathed to a particular child, providing:

[A]nd should there be any royalty sold during my lifetime then [the three children], *shall each receive one-third of the remainder of the unsold royalty.* (Emphases added.)

Before and after executing the will, Ethel made several *inter vivos* conveyances to her children. In 1946, Ethel gifted equal royalty interests in the 200– and 150–acre tracts to each child.[3] In 1948, she conveyed the surface estate of the 200–acre tract to Howard. The remainder of Ethel's real property interests passed under her will when she died in 1949. The Hysaw children have since passed away, and

1. We refer to Ethel and her children by their given names to avoid confusion.

2. There is no dispute that the interest at issue is a royalty interest, not a mineral interest.

3. To each child Ethel gave a "one-eighth (1/8) of one-eighth (1/8) royalty" subject to an existing lease and equal to "one-sixty/fourth (1/64) of the total production" from the 200–acre tract. She also gave each child a "one-fourth (1/4) of one-eighth (1/8) royalty" equal to "one-thirty/second (1/32) of the total production" from the 150–acre tract.

their property interests in the devised lands have passed to their descendants and other successors in interest.

The ties that bind surely wither through the ages, and even more so when market influences increase the economic stakes, as they have in the present case.[4] These days, landowners fare better in royalty negotiations than in Ethel's day, frequently securing mineral leases offering royalties larger than 1/8. *Compare* Lee Jones, Jr., *Non–Participating Royalty*, 26 TEX. L. REV. 569, 575 (1948) ("The usual royalty is 1/8, and this fact is so generally known that judicial knowledge may be taken of it."), *with Graham v. Prochaska*, 429 S.W.3d 650, 657 (Tex.App.–San Antonio 2013, pet. denied) ("Leases containing royalties larger than one-eighth became increasingly common in the mid–1970's." (citing 1 SMITH & WEAVER, TEXAS LAW OF OIL & GAS § 2.4[B][1], at 2–64)). Consistent with the market trend, Inez's successors[5] executed a mineral lease in 2008 that provided for a 1/5 royalty on the 600 acres bequeathed to Inez in Ethel's will.

The underlying declaratory-judgment action, initiated by Howard's successors,[6] ensued after Inez's successors advanced a construction of Ethel's will that produced unequal sharing of royalties among her heirs and benefitted Inez's successors. Inez's successors asserted that (1) Howard's 200–and 150–acre tracts were burdened by a floating (fraction of) royalty based on Ethel's *inter vivos* conveyance of royalty interests in those tracts, (2) for Inez's 600–acre tract and Dorothy's 465–acre tract, Ethel's will fixed each non-fee

owner's royalty interest at 1/24 (a simple calculation of 1/3 times a fixed 1/8 royalty), and (3) excess royalties on the 600– and 465–acre tracts belonged to the fee owner.

Howard's successors and Dorothy's successors[7] were aligned in opposition to this construction of the will. In their view, multiplying the double fractions in Ethel's will and fixing the devised royalty interest (1) is discordant with will language evincing an intent that the siblings share royalties equally; (2) adds language not found in the deed by inserting a fixed, single fraction of 1/24; and (3) creates disharmony among the provisions by mixing fractional royalty interests with fraction of royalty interests to produce unequal treatment of Ethel's children. Howard's and Dorothy's successors have taken the position that the will gave each child a "floating" 1/3 of any royalty obtained from all the land tracts, resulting in equal sharing of royalties under all future leases. They thus claim each sibling line is entitled to a 1/15 royalty under the mineral lease on the land devised to Inez (1/3 of the 1/5 royalty provided in the lease).

After stipulating to the pertinent facts, the parties filed cross-motions for summary judgment. The trial court denied the motion filed by Inez's successors and granted the motion filed by Howard's and Dorothy's successors, rendering judgment that Ethel's will entitled each child to 1/3 of any and all royalty interest on all the devised land tracts.

The court of appeals reversed and rendered judgment in favor of Inez's succes-

---

4. "Blood may be thicker than water, but oil is thicker than both." *Dallas: The Changing of the Guard* (TNT television broadcast June 13, 2012) (J.R. Ewing, perf. by Larry Hagman).

5. Inez's Successors are Bretton Guy Dawkins, Bradley Ken Dawkins, Jerry Howard Oxford, and Sharon Ann Oxford.

6. Howard's Successors are Madelon Hysaw and Kathryn Hysaw Weafer.

7. Dorothy's Successors are Michael and Cindy Burris Family Partnership III, Ltd., Byron M. Burris, and Judith Ann Burris Dziuk.

sors, holding that Ethel's will unambiguously devised (1) all mineral interests in the 1065–acre tract, including royalty interests, to the surface-estate devisee subject only to two 1/24 fractional royalty interests held by the non-fee-owning siblings and (2) a floating one-third of any future royalty on the 200–acre and 150–acre tracts. 450 S.W.3d 147, 157 (Tex. App.–San Antonio 2014). Thus, under the court of appeals' analysis, due to Ethel's *inter vivos* royalty gifts to the children, her will effected equal sharing of royalties earned on Howard's tracts, but greater royalty interests to the fee-simple owners of Inez's and Dorothy's tracts (a fixed 1/24 plus any royalty in excess of the two 1/24 royalty interests bequeathed to the non-surface-owning siblings).

In arriving at this construction of the will, the court of appeals first considered the meaning of each royalty provision in isolation, and then evaluated whether the provisions, as so construed, conflicted with one another. *Id.* at 155. The court interpreted the first royalty interest provision—which granted to "each of [Ethel's] children ... an undivided one-third (1/3) of an undivided one-eighth (1/8)"—as unambiguously conveying a fixed fractional royalty of 1/24 to each child. *Id.* at 154. The court afforded the same construction to the second royalty-interest provision—which reiterated that each child, by name, "shall receive one-third of one-eighth royalty" unless an *inter vivos* royalty conveyance had been effected on "the lands so willed to [that child]." *Id.* at 152–54. However, the court concluded the third royalty provision—applying only in the event of an *inter vivos* royalty sale and providing that "each [child] receive one-third of the remainder of the unsold royalty"–unambiguously devised a floating one-third of any and all royalty. *Id.* at 155. Despite the court's determination that the will described both fixed and floating royalty interests, the court found no inconsistency in this construction of the will, concluding (1) the second royalty provision did not fix the *surface-owner's* mineral interest but was merely a restatement of the first royalty provision, (2) any excess royalty to the surface owner occurred by operation of the fee-simple devise, and (3) the third royalty provision was restricted to a specific condition that operated independently from the other two royalty clauses. *Id.* at 155–56.

On appeal to this Court, the decisive issue remains the proper interpretation of the double-fraction language in Ethel's will in light of other testamentary language indicating Ethel intended to treat her children similarly with respect to their royalty interests.

## II. Discussion

Our objective in construing a will is to discern and effectuate the testatrix's intent as reflected in the instrument as a whole. *See Shriner's Hosp. for Crippled Children of Tex. v. Stahl,* 610 S.W.2d 147, 151 (Tex.1980); *Bergin v. Bergin,* 159 Tex. 83, 315 S.W.2d 943, 946 (Tex.1958). As we have explained, "[t]he intent must be drawn from the will, not the will from the intent." *San Antonio Area Found. v. Lang,* 35 S.W.3d 636, 640 (Tex.2000) (quoting *Lehman v. Corpus Christi Nat'l Bank,* 668 S.W.2d 687, 688 (Tex.1984)). Thus, we "focus not on 'what the testatrix intended to write, but the meaning of the words she actually used.'" *Id.* at 639 (quoting *Shriner's Hosp.,* 610 S.W.2d at 151). Ascertaining intent from the four corners of a will requires careful examination of the words the testatrix chose, *id.* and "[t]he sense in which the words were used by the testator is the ultimate criterion." *Stewart v. Selder,* 473 S.W.2d 3, 7 (Tex.1971).

If the terms of a will are ambiguous, extrinsic evidence is admissible to determine the testatrix's intent, *Lang*, 35 S.W.3d at 639, and a presumption arises that she intended to treat heirs of the same class equally, *Sinnott v. Gidney*, 159 Tex. 366, 322 S.W.2d 507, 512 (Tex.1959). Furthermore, when a term in a will "is open to more than one construction," a court can consider "the circumstances existing when the will was executed." *Lang*, 35 S.W.3d at 639; *see Mattern v. Herzog*, 367 S.W.2d 312, 314 (Tex.1963); *cf. Kachina Pipeline Co. v. Lillis*, 471 S.W.3d 445, 450 (Tex.2015) (explaining a court can consider surrounding circumstances to interpret contract language but not to create ambiguity). Fundamentally, "[t]here are many rules of law surrounding the construction of a will but there is one over-all rule, which is to the effect that there is no set rule that will fit the construction of every will, and therefore each case must stand under its own facts." *Taylor v. First Nat'l Bank of Wichita Falls*, 207 S.W.2d 428, 431 (Tex.Civ.App.–Fort Worth 1948, no writ).

Similar construction principles apply to non-testamentary instruments conveying mineral interests. *Luckel*, 819 S.W.2d at 461–62 (the primary objective in construing mineral grants is to ascertain intent from the four corners of the instrument based on the words used and not the subjective intent of the parties); *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 731 (Tex.1981) (surrounding circumstances may inform the meaning of text and render it capable of only one meaning). In such cases, we have favored a holistic and harmonizing approach and rejected mechanical rules of construction, such as giving priority to certain types of clauses over others or requiring the use of magic words. *See Luckel*, 819 S.W.2d at 463–64 (overruling *Alford v. Krum*, 671 S.W.2d 870 (Tex.1984), which had afforded controlling weight to the

granting clause over another provision in the conveyance); *see also Concord Oil Co.*, 966 S.W.2d at 460–61 (rejecting invitation "to adopt 'firm' or 'bright-line' rules for construing mineral and royalty conveyances that contain differing fractions," because such rules "are arbitrary" and "will not always give effect to what the conveyance provides as a whole"); *id.* at 465 (Gonzalez, J., dissenting) (acknowledging *Luckel*'s salient holding as a rejection of "mechanical rules of construction"); *accord Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006) (explaining no single provision in a contract "taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument" (quoting *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983)).

In this case, questions of testamentary intent arise due, in part, to the use of double fractions in two of the will's three royalty provisions, the absence of any expression of the royalty devise as a single or fixed fraction, the equal-sharing language in the residual royalty clause, the prevalence of 1/8 as the standard royalty at the time Ethel executed her will, and the fee simple devise of the surface estates. Because some contextual prologue is helpful to understand the nature of the dispute, our consideration of the language in Ethel's will is preceded by a brief discussion of mineral-interest conveyances, the legacy of the then-standard 1/8 royalty, and a related theory of "estate misconception."

## A. Mineral–Interests Overview

An instrument conveying land in fee simple transfers both the surface estate and all minerals and mineral rights, unless the instrument contains a reservation or expresses a contrary intention. *Schlittler v. Smith*, 128 Tex. 628, 101

S.W.2d 543, 544 (1937). The mineral estate is comprised of five severable rights: "1) the right to develop, 2) the right to lease, 3) the right to receive bonus payments, 4) the right to receive delay rentals, and 5) the right to receive royalty payments." *French v. Chevron U.S.A. Inc.*, 896 S.W.2d 795, 797 (Tex.1995). The holder of the leasing privilege is the executive-interest holder. *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 75 (Tex.2015). The executive enjoys the exclusive right to make and amend mineral leases and, correspondingly, to negotiate for the payment of bonuses, delay rentals, and royalties, subject to a duty of utmost good faith and fair dealing to non-executive interest holders. *Id.* at 74–75 (citing Jones, 26 TEX. L. REV. at 569, and *Plainsman Trading Co. v. Crews*, 898 S.W.2d 786, 789–90 (Tex.1995)). "In Texas, a typical oil and gas lease actually conveys the mineral estate (less those portions expressly reserved, such as royalty) as a determinable fee," with the possibility of reverter as a future interest. *Luckel*, 819 S.W.2d at 464.

"A royalty interest derives from the grantor's mineral interest and is a nonpossessory interest in minerals that may be separately alienated." *Id.* at 463. "The same instrument may convey an undivided portion of the mineral estate and a separate royalty interest, and the royalty interest conveyed may be larger or smaller than the interest conveyed in the minerals in place." *Id.* A party possessing a royalty interest that does not include the right to lease the mineral estate, receive delay rentals, or bonus payments is referred to as a non-participating royalty-interest holder. *KCM Fin.*, 457 S.W.3d at 75.

Royalty interests may be conveyed or reserved "as a fixed fraction of total production" (fractional royalty interest) or "as a fraction of the total royalty interest" (fraction of royalty interest). *Luckel*, 819 S.W.2d at 464. A fractional royalty interest conveys a fixed share of production and "remains constant regardless of the amount of royalty contained in a subsequently negotiated oil and gas lease." *Coghill v. Griffith*, 358 S.W.3d 834, 838 (Tex.App.–Tyler 2012, pet. denied). In comparison, a fraction of royalty interest (as a percentage of production) varies in accordance with the size of the landowner's royalty in a mineral lease and "is calculated by multiplying the fraction in the royalty reservation by the royalty provided in the lease." *Id.*; *see Luckel*, 819 S.W.2d at 464.

## B. The Double–Fraction Dilemma

Discerning the nature of a particular royalty interest may be a simple matter when an instrument consistently uses single fractions to describe the interest. *See Garrett v. Dils Co.*, 157 Tex. 92, 299 S.W.2d 904, 906 (Tex.1957) (because the granting clause contained a fixed, stated fraction "there would be no doubt as to the interest conveyed ... [h]ad other language in the deed not disclosed what the parties understood [the fixed fraction] to mean"). But conveyances containing double fractions or two or more differing fractions present recurring interpretative challenges. *See id.*; *Concord Oil Co.*, 966 S.W.2d at 452, 454.

Instruments employing double fractions to convey or reserve mineral interests almost invariably involve multiples of 1/8, a royalty rate so pervasive that, for decades, courts took judicial notice of it as the standard and customary royalty.[8] The

---

8. *See, e.g., Luckel v. White*, 819 S.W.2d 459, 462 (Tex.1991); *Garrett v. Dils Co.*, 157 Tex. 92, 299 S.W.2d 904, 907 (Tex.1957); *see also*

*Concord Oil Co. v. Pennzoil Expl. & Prod. Co.*, 966 S.W.2d 451, 459–60 (Tex.1998) (plurality op.) (acknowledging 1/8 as the usual and cus-

near ubiquitous nature of the 1/8 royalty–dubbed by some as "the legacy of the 1/8th royalty" or "historical standardization"–no doubt influenced the language used to describe the quantum of royalty in conveyances of a certain vintage.[9] However, the possibility that the parties were operating under the assumption that future royalties would remain 1/8 will not alter clear and unambiguous language that can otherwise be harmonized. *See Luckel*, 819 S.W.2d at 462–63 (because an assumption that the parties contemplated the usual one-eighth royalty was "equally consistent" with language fixing the royalty interest as it was with language suggesting a floating royalty interest, the court of appeals erred in favoring one construction over the other based on that assumption).

◼ A related issue that may be implicated in double-fraction cases is the theory of "estate misconception." This theory refers to a once-common misunderstanding (perpetuated by antiquated judicial authority) that a landowner retained only 1/8 of the minerals in place after executing a

mineral lease instead of a fee simple determinable with the possibility of reverter in the entirety.[10] "For example, a lessor who has leased the entire mineral estate, but desires to sell one half [sic] of the minerals, would assume that he owned 1/8 of the minerals due to the existing lease ... [and] would use the fraction 1/16, or a double fraction, 1/2 of 1/8, to convey 1/2 of what he perceived he owned." Laura H. Burney, *The Regrettable Rebirth of the Two-Grant Doctrine in Texas Deed Construction*, 34 S. TEX. L. REV. 73, 89 (1993).

◼ Though not inexorably so, the reality is that use of 1/8 (or a multiple of 1/8) in some instruments undoubtedly embodies the parties' expectation that a future lease will provide the typical 1/8th landowners' royalty with no intent to convey a fixed fraction of gross production.[11] Indeed, as commentators have noted, there is "little explanation" for the use of double factions to express a fixed interest absent a misunderstanding about the grantor's re-

tomary royalty for an era and observing that mineral or royalty deeds containing differing fractions usually involve a multiple of 1/8); *Graham v. Prochaska*, 429 S.W.3d 650, 657 (Tex.App.–San Antonio 2013, pet. denied) ("Leases containing royalties larger than one-eighth became increasingly common in the mid–1970's." (citing 1 SMITH & WEAVER, TEXAS LAW OF OIL & GAS § 2.4[B][1], at 2–64)).

9. *See Garrett*, 299 S.W.2d at 907 ("The court takes judicial knowledge of the fact that the usual royalty provided in mineral leases is one-eighth. The parties doubtless assumed that the royalty under future leases would be one-eighth, as it was under the lease in existence when the deed was executed."); *Graham*, 429 S.W.3d at 657 ("The historical standardization of the landowner's royalty at one-eighth of production has sometimes created confusion in the construction of deeds from that period, where the use of conflicting fractions suggests the parties mistakenly assumed the landowner's royalty would always be one-eighth.").

10. *Concord Oil Co.*, 966 S.W.2d at 459–60; *Graham*, 429 S.W.3d at 658; *see* Frank W. Elliott, Jr., *The Fractional Mineral Deed "Subject to" a Lease*, 36 TEX. L. REV. 620, 622 (1958) (describing the "greatest source of confusion" in construing mineral deeds is that "[t]he lessor often thinks of his ownership as a 1/8th royalty interest rather than a possibility of reverter in all the minerals");

11. *Coates Energy Trust v. Frost Nat'l Bank*, No. 04-11-00838-CV, 2012 WL 5984693, at *6 (Tex.App.–San Antonio 2012, pet. denied) (mem.op.) (stated fraction of 1/16, when considered with other language in the deed and the "usual" 1/8 royalty, actually conveyed 1/2 fraction of royalty); *accord Garrett*, 299 S.W.2d at 907 (explaining the provision defining ownership under a future lease as "one-eighth of one-eighth" served to emphasize the intention "to convey one-eighth of the royalty under future leases the same as under the original lease").

tained ownership interest or use of 1/8 as a proxy for the customary royalty. 2 HOWARD R. WILLIAMS & CHARLES J. MEYERS, OIL AND GAS LAW § 327.2, at 90–91 (Patrick H. Martin & Bruce M. Kramer eds., 2015) (noting that estate misconception is most likely at play in double-fraction cases but advocating multiplication of double fractions to effectuate plain meaning); Laura H. Burney, *Interpreting Mineral and Royalty Deeds: The Legacy of the One–Eighth Royalty and Other Stories*, 33 ST. MARY'S L.J. 1, 24 (2001) (arguing that the appearance of 1/8 in a double fraction is patent evidence the parties were operating under the estate misconception). For these reasons, double-fraction language frequently generates disagreement about whether the interest conveyed or reserved is actually a fixed (fractional) royalty or floating (fraction of) royalty, especially when other language in the instrument appears to be contradictory or inconsistent. Doing little to pour oil on turbulent waters,[12] court opinions construing double-fraction language have yielded mixed results, with no discernible unifying principle except to the extent the outcome derives from the conveying instrument's specific language.[13]

---

12. In 1762, Benjamin Franklin repeated an experiment of Pliny the Elder, demonstrating that a little oil can calm rough seas. Of his experiment, he wrote:

> At length being at CLAPHAM, where there is, on the common, a large pond, which I observed to be one day very rough with the wind, I fetched out a cruet of oil, and dropt a little of it on the water. I saw it spread itself with surprising swiftness upon the surface; but the effect of smoothing the waves was not produced; for I had applied it first on the leeward side of the pond, where the waves were largest, and the wind drove my oil back upon the shore. I then went to the windward side, where they (the waves) began to form; and the oil, though not more than a teaspoonful, produced an instant calm over a space several yards square, which spread amazingly, and extended itself gradually till it reached the lee side, making all that quarter of the pond, perhaps half an acre, as smooth as a looking glass.

Charles Tanford, BEN FRANKLIN STILLED THE WAVES: AN INFORMAL HISTORY OF OIL ON WATER WITH REFLECTIONS ON THE UPS AND DOWNS OF SCIENTIFIC LIFE IN GENERAL 83 (Oxford University Press 2004).

13. *Compare, e.g., Butler v. Horton*, 447 S.W.3d 514, 516–17, 519 (Tex.App.–Eastland 2014, no pet.) ("one-half of the usual 1/8th royalty" and "one-half of the royalty" reserved a floating fraction of royalty), *Coghill v. Griffith*, 358 S.W.3d 834, 835–36, 840 (Tex.App.–Tyler 2012, pet. denied) (coming to the same conclusion when deed reserved "one-eighth (1/8) interest in and to all of the [royalty]," subject to a "one-eighth (1/8) of all royalties payable under the terms of [an existing lease]," and further reserved "one-eighth (1/8) of the usual one-eighth (1/8) royalties provided for [in future leases]," on the condition that such lease "shall provide for *at least* a royalty on oil of the usual one-eighth (1/8)" and further reserving "an undivided one-sixty fourth (1/64)" of production in the event of development by the mineral fee owner), *Coates Energy*, 2012 WL 5984693, at *1, *6 (holding multi-clause deed conveyed a floating 1/2 nonparticipating mineral interest, when deed granted "one-half interest" in the minerals, "one-half" of the 1/8 royalties under an existing lease and "1/16th" of production payable out of the royalty provided in future leases), *Sundance Minerals, L.P. v. Moore*, 354 S.W.3d 507, 510, 512 (Tex. App.–Fort Worth 2011, pet. denied) (deed reserving "one-half interest in the [minerals]" and describing the reservation as "one half of the usual one eighth royalty [sic]" reserved 1/2 of royalties, not fixed 1/16 royalty), *with Moore v. Noble Energy*, 374 S.W.3d 644, 645, 651 (Tex.App.–Amarillo 2012, no pet.) (deed reserving "a one-half non-participating royalty interest (one-half of one-eighth of production)" reserved a fixed fractional royalty, not fraction of royalty), *Wynne/Jackson Dev., L.P. v. PAC Capital Holdings, Ltd.*, No. 13–12–00449–CV, 2013 WL 2470898, at *1, *5 (Tex. App.–Corpus Christi June 6, 2013, pet. denied) (mem.op.) (deed reserving "one-half (1/2) of the usual one-eighth (1/8) royalty" reserved fixed "fractional royalty, not fraction of royalty").

In fractional-royalty cases, courts generally take the straight-forward mathematical approach of multiplying double fractions to establish the fractional royalty interest.[14] In this line of cases, phrases such as "the usual 1/8 royalty" or "the 1/8 royalty" are not accorded any particular significance.[15] Also present in many fractional royalty cases is a restatement of the double-fraction language expressed as a single fraction.[16] Sometimes, the absence of language creating an inconsistency has been expressly noted. *See Hudspeth v. Berry*, No. 2–09–225–CV, 2010 WL 2813408, at *4 (Tex.App.–Fort Worth July 15, 2010, no pet.) (mem.op.) (distinguishing our opinions in *Luckel* and *Concord Oil* on that basis).

A mechanically applied, mathematical approach is appealing because it provides a bright line for resolving the double-fraction problem and, thus, certainty. This approach also purports to afford weight to each of the expressed fractions under a plain-meaning analysis. *See* WILLIAMS & MEYERS, OIL & GAS LAW § 327.2, at 90–91 (approving of multiplying double fractions under a plain-meaning approach despite acknowledging existence of likely alternative meaning when multiple of 1/8 is used). However, the mechanical approach fails to accord any significance to the use of double fractions in lieu of a single fraction and, in doing so, may interpolate words not actually expressed in an instrument (i.e., a fixed single fraction). *See* Burney, 33 ST. MARY's L.J. at 3–4.

Courts determining that double-fraction language created a floating royalty typically adhere to an analytical approach that emphasizes the four-corners rule and harmonization principles of our precedent in *Garrett, Luckel,* and *Concord Oil.* Similar to this trilogy of cases, the conveying instruments in fraction-of-royalty cases tend to be more complex than in the fractional

14. *See Graham*, 429 S.W.3d at 658 ("[C]ourts generally construe simple grants or reservations ... as creating a fixed royalty interest, the size of which is determined by multiplying the two fractions together ... accord[ing] with the literal, mathematical meaning of a 'fraction of a fraction.'"); *see, e.g., Wynne/Jackson Dev.*, 2013 WL 2470898, at *1, *4–5.

The case of *Harriss v. Ritter* presents a combination scenario involving a three-fraction reservation: "one-half *of* one-eighth *of* the ...: mineral royalty that may be produced from said land." 154 Tex. 474, 279 S.W.2d 845, 846 (1955) (emphases added). The issue was whether the royalty was fixed at 1/16, and we held that the phrase did not reserve "one-half of one-eighth royalty," but plainly reserved "1/16th *of* the royalty on all the oil, gas or other minerals that may be produced from said land." *Id.* at 847 (emphasis added). We therefore multiplied the first two fractions, but also gave effect to the fraction of royalty language that followed.

15. *See Allen v. Creighton*, 131 S.W.2d 47, 49–50 (Tex.Civ.App.–Beaumont 1939, writ ref'd); *Wynne/Jackson Dev.*, 2013 WL 2470898, at

*4–5; *Hawkins v. Tex. Oil & Gas Corp.*, 724 S.W.2d 878, 889 (Tex.App.–Waco 1987, writ ref'd n.r.e.); *Helms v. Guthrie*, 573 S.W.2d 855, 856–57 (Tex.Civ.App.–Fort Worth 1978, writ ref'd n.r.e.). *But see Graham*, 429 S.W.3d at 659–60 (considering meaning of "*the* one-eighth (1/8) royalty" in context of deed as a whole and concluding fraction of royalty was reserved: "The use of the word 'the' denotes that 'the one-eighth royalty' is a distinct or particular royalty."); *Coghill*, 358 S.W.3d at 836, 839 (deed reserving "one-eighth (1/8) of the usual one-eighth (1/8)" and setting minimum royalty of "the usual one-eighth (1/8)" reserved floating royalty).

16. *See, e.g., Hudspeth v. Berry*, No. 2–09–225–CV, 2010 WL 2813408, at *2 (Tex.App.–Fort Worth July 15, 2010, no pet.) (mem.op.) (reserving an "undivided 1/40th royalty interest (being 1/5th of 1/8th)"); *Tiller v. Tiller*, 685 S.W.2d 456, 458 (Tex.App.–Austin 1985, no writ) (reserving "1/9 of the 1/8 royalty, (1/72) of all the oil, gas and other minerals, produced from said land"); *Helms*, 573 S.W.2d at 856 (construing deed reserving "1/2 of the 1/8th royalty (same being a 1/16th of the total production) of oil, gas, and minerals").

royalty cases, with apparently contradictory or inconsistent terms that courts must harmonize, if possible, to give effect to all the words and the intent of the parties as expressed in the instrument.[17] The permutations of deed language reflected in this line of cases underscores the case-specific nature of the inquiry.

■ Variety of outcome should be expected because written instruments must be interpreted in light of the parties' intent as expressed in the entire document. *See Graham*, 429 S.W.3d at 661 (explaining "the deed before us contains additional language that provides the context necessary to objectively determine that the parties assumed the landowner's royalty would always be one-eighth of production"). But some discordance in the jurisprudence may result from a misapplication of the analytical approach we have long-endorsed.

■ Today, we reaffirm our commitment to a holistic approach aimed at ascertaining intent from all words and all parts of the conveying instrument. To discern intent, words and phrases must be construed together and in context, not in isolation. *See Plainsman Trading Co.*, 898 S.W.2d at 789; *cf. State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995) ("Indeed, courts must be particularly wary of isolating from its surroundings or considering apart from other provisions a single phrase, sentence, or section of a contract."). Words and phrases generally bear their ordinary meaning unless the context supports a technical meaning or a different understanding. *See In re Office of the Att'y Gen. of Tex.*, 456 S.W.3d 153, 155–56 (Tex.2015) ("Given the enormous power of context to transform the meaning of language, . . . [t]he import of language, plain or not, must be drawn from the surrounding context, particularly when construing everyday words and phrases that are inordinately context-sensitive."); *see also Plains Expl. & Prod. Co. v. Torch Energy Advisors, Inc.*, 473 S.W.3d 296, 305 (Tex.2015). Similarly, apparent inconsistencies or contradictions must be harmonized, to the extent possible, by construing the document as a whole. *Luckel*, 819 S.W.2d at 462. But considering whether inconsistencies might exist and how they may be harmonized is part of the process for determining intent; it is not merely a cross-check method of validating an interpretation derived by segregating key terms and phrases. That is to say, meaning derived without reference to context is not confirmed merely because such a construction would not produce an inconsistency with another provision.

■ We further eschew reliance on mechanical or bright-line rules as a substitute for an intent-focused inquiry rooted in the instrument's words. To that end, the estate-misconception theory and the historical use of 1/8 as the standard royalty may inform the meaning of fractions stated in multiples of 1/8, but these considerations are not alone dispositive. *Cf.* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 78 (2012) ("Words must be given the meaning they had when the text was adopted.").

■ In this case, the court of appeals departed from the appropriate analytical approach by construing each royalty provision in isolation, deriving their meaning by comparing them to exemplar phrases that

17. *See* n.13, *supra* ; *see also Graham*, 429 S.W.3d at 658 ("Sometimes . . . the context of the entire deed leads courts to harmonize variations of a 'fraction of one-eighth' in favor of finding a floating royalty."); *Garza v. Prolithic Energy Co., LP.*, 195 S.W.3d 137, 139–40, 146 (Tex.App.–San Antonio 2006, pet. denied).

were themselves divorced from context. 450 S.W.3d at 154–55 (citing examples of fractional-royalty and fraction-of-royalty language excerpted in WILLIAMS & MEYERS, OIL AND GAS LAW § 327.1 (abridged 5th ed.2013), and comparing each phrase to its closest linguistic match). But double fractions in a mineral conveyance may or may not evince intent to fix the interest. Consequently, before ascribing any particular meaning to double-fraction language in a conveying instrument, all the other language in the document must be considered to deduce intent. *See Garrett*, 299 S.W.2d at 906–07 (use of double fraction juxtaposed with single fraction in another provision clarified that the grantor intended to reserve floating royalty under future leases).

### C. Ethel's Will

We begin our analysis of Ethel's will with the language distributing her real property. Ethel devised different-sized land tracts to each child; specifically, more acreage to Inez and Dorothy than to Howard. However, nothing in the will suggests Ethel intended to favor her daughters over her son based solely on this size-disparity. To the contrary, the intrinsic value of the land bequeathed to Howard is expressly noted.[18]

When land is devised in fee simple, as it was here, the devise includes the mineral estate except on terms so specified. *Schlittler*, 101 S.W.2d at 544. Ethel's devise did not transfer all the interests in the mineral estate. Rather, the will describes, as follows, the royalty interests bequeathed to each child that were severed from the fee-simple devise:

> I will and bequeath to each of the above named children fee simple title to the lands designated to go to them, subject, however, to the following . . . [1] each of my children shall have and hold an undivided one-third (1/3) of an undivided one-eighth (1/8) of all oil, gas or other minerals in or under or that may be produced from any of said lands, the same being a non-participating royalty interest; that is to say . . . [the named child] shall not participate in any of the bonus or rentals to keep any lease or leases in force; that it shall not be necessary for the said [named child] to execute any oil, gas or mineral lease over the lands of [the siblings], and that it shall not be necessary for [the named child] to obtain the consent either orally or written of the said [siblings], to lease any portion of said land so willed to [the named child] for oil, gas or other minerals, but that [2] the said [named child] shall receive one-third of one-eighth royalty, provided there is no royalty sold or conveyed by me covering the lands so willed to [the child], and [3] should there be any royalty sold during my lifetime then [the three children] shall each receive one-third of the remainder of the unsold royalty. (Alterations and emphases added.)

Using identical language addressed to each child, Ethel's will thus:

- bequeathed to each child "an undivided one-third (1/3) of an undivided one-eighth (1/8) of all oil, gas or other minerals in or under or that may be produced from any of said lands the same being a non-participating royalty interest";

- confirmed the non-participatory nature of the devised royalty by conferring to the fee owner the executive

---

18. "To my son Howard Caldwell Hysaw, Jr., approximately 150 acres of land where I now reside, being my homestead, and a tract of 200 acres of land that was formerly given to me by my father. . . ."

right and the right to receive bonus payments and delay rentals;

- described each fee-owner's right to receive royalty payments as "one-third of one-eighth royalty"; and

- made express provision that, "should there be any royalty sold during my lifetime," the children "shall each receive one-third of the remainder of the unsold royalty."

Absent other indicators of testamentary intent, it might be plausible to read the double-fraction royalty devise in the first two royalty provisions as a mathematical expression describing a fractional royalty; under such a reading, any excess royalty would default to the fee owner. However, other language in the will and the overall structure of the royalty devise confirms Ethel's intent to treat the children equally in the distribution of the devised royalty interests and, thus, to legate a floating 1/3 royalty to each.

 Evidencing Ethel's intent to equally divide the royalties among the children is (1) the deliberate recitation of identical language to effect each child's royalty inheritance; (2) the use of double fractions in lieu of single fixed fractions, with one fraction connoting equality among the three children (1/3) and the other raising the specter of estate misconception or use of the then-standard 1/8 royalty as a synonym for the landowner's royalty; (3) the first royalty provision's global application to all the children and the second provision's language restating the royalty devise of each child individually; and (4) the equal-sharing language in the third and final royalty clause.

Most telling of testamentary intent is the third royalty clause, in which Ethel clearly provided for equal sharing of royalties among the children as to lands affected by an *inter vivos* royalty sale. In the event Ethel sold some of her royalty interest prior to her death, the third royalty provision specified that each child would "receive one-third of the remainder of the unsold royalty." The court of appeals correctly interpreted this provision as unambiguously conveying a floating fraction of royalty interest. However, due to the provision's conditional nature, the court failed to recognize its significance in ascertaining the testatrix's intent. 450 S.W.3d at 156. Even if no operational inconsistency ensues from reading the first two royalty provisions as describing a fractional royalty and the third as describing a fraction of royalty, such a reading produces an inconsistency with regard to testamentary intent.

The third royalty clause demonstrates that Ethel intended the royalty devise to be equal and that re-equalization would be required if an *inter vivos* event diminished the available royalty. If Ethel had truly intended the fee-owning child to benefit exclusively from any excess royalty, as Inez's successors argue, equalization following a royalty-diminishing transaction would produce a paradoxical result. The only plausible construction supported by a holistic reading of the will is that Ethel used "one-eighth royalty" as shorthand for the entire royalty interest a lessor could retain under a mineral lease,[19] anticipated the siblings would share that royalty equally, and intended proportional equalization of any royalty remaining following

---

19. Inez's successors argue the third royalty provision would be unnecessary if double-fraction language already connoted equal sharing of royalties. That argument fails, however, if Ethel understood 1/8 to be the entire royalty interest. Operating under that misconception, the royalty interest could be diminished by transactions following execution of her will, requiring equalization of "the remainder of the unsold royalty."

an *inter vivos* transaction.[20] We therefore hold that Ethel's will devised to each child 1/3 of any and all royalty interest on all the devised land tracts.

### III. Conclusion

When the terms of a mineral conveyance are in dispute, our objective is to effectuate the parties' intent as expressed within the four corners of the conveying instrument. Intent must be determined by a careful and detailed examination of the document in its entirety, rather than by application of mechanical rules of construction that offer certainty at the expense of effectuating intent. Ethel Hysaw's will, when so considered, demonstrates her intent to convey an equal royalty interest to each of her three children. We therefore reverse the court of appeals' judgment and render judgment that the Hysaw will devised a 1/3 fraction of royalty, not a 1/24 fractional royalty.

---

**20.** Different-sized land tracts might reasonably produce different-sized lease bonuses, which were reserved to the fee owner. Inez's successors point to this disparity as proof that Ethel intended her mineral-estate distributions under the will to be unequal. But even if Ethel did not intend to distribute all mineral estate attributes equally, we must still give effect to clear textual evidence of testamentary intent with regard to equal sharing of the devised royalty interests.