

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| POWDER RIVER MINERAL PARTNERS, LLC, SUE MAY, FRED HERRING, LTD., LAFAYETTE BROWN HERRING, III, and HERBERT MINERALS, LTD., | § | No. 08-23-00058-CV |
| | § | Appeal from the |
| | § | 143rd Judicial District Court |
| Appellants, | § | of Reeves County, Texas |
| v. | § | (TC# 21-08-24105-CVR) |
| CIMAREX ENERGY CO., FORD CHAPMAN PROPERTIES, LLC, PECOS VALLEY PETROLEUM COMPANY, WILLIAM ROGER MAYS, FORD CHAPMAN MAYS, FORD CHAPMAN MAYS II, ANDREW HUGH MAYS, DONNA CALDWELL PROPERTIES, LLC, CALDWELL FAMILY TRUST, MARY WINTER ANDERSON, CHAPMAN PROPERTIES TRUST, CLIFFORD JAMES HARDWICK, MARK NETTLES HARDWICK, NANCY LOUISE GIERHART, SARAH HARDWICK BELL, HEATHER ANNE POTTS, ELIZABETH SUTTON HARDWICK, JULIE KATE OLDHAM, MATTHEW LYNN GIERHART, ROBIN LOUISE MORRISON, ELLEN HARDWICK ENRIGHT, AMY LOUISE FALCO, HELEN MARGARET HARMAN, ANNABELLE ELIZABETH MAYS, PEGASUS RESOURCES, LLC, GGM EXPLORATION, INC., TD MINERALS LLC, AND TILDEN CAPITAL MINERALS, LLC, | § § § § § § § § § § § § § | |
| Appellees. | § | |

# MEMORANDUM OPINION

In this appeal, we are asked to interpret a 1947 deed granted by N.F. Chapman and A.S. Chapman to Jack May (the Chapman-May Deed or the Deed). Specifically, we are confronted with a "double-fraction dilemma," or "seeming oddity" as recently characterized by the Supreme Court of Texas, where parties' insists on using two fractions in their mineral conveyances of a certain vintage. *See Van Dyke v. Navigator Group*, 668 S.W.3d 353, 357 (Tex. 2023). Appellant Powder River Mineral Partners, LLC (Powder River), a successor-in-interest to the May side of the Chapman-May Deed, filed suit against Appellee Cimarex Energy Co. (Cimarex), the current lessee of the subject mineral estate, alleging a failure to pay Powder River its full proportionate share of proceeds attributable to its interest under the Deed. Cimarex answered with a general denial. Soon, however, it interpleaded other parties known to hold an interest in the subject mineral estate for the purpose of establishing their respective claims to the disputed royalty interest. As a result, Powder River was joined in the action by several successors-in-interest to the May side of the Deed.[1] As well, on the Chapman side of the transaction, several successors-in-interest appeared in opposition to the May successors' claims.[2]

---

[1] These parties are OMJV1 Mineral Sub, LLC, Herbert Minerals Ltd., Fred Herring, Ltd., Lafayette Herring, Elaine Herring, and Sue May.

[2] These parties are Ford Chapman Properties, LLC, Pecos Valley Petroleum Company, William Roger Mays, Ford Chapman Mays, Ford Chapman Mays II, Andrew Hugh Mays, Donna Caldwell Properties, LLC, Caldwell Family Trust, Mary Winter Anderson, Chapman Properties Trust, Clifford James Hardwick, Mark Nettles Hardwick, Nancy Louise Gierhart, Sarah Hardwick Bell, Heather Anne Potts, Elizabeth Sutton Hardwick, Julie Kate Oldham, Matthew Lynn Gierhart, Robin Louise Morrison, Ellen Hardwick Enright, Amy Louise Falco, Helen Margaret Harman, and Annabelle Elizabeth Mays (collectively, the Chapman Successors); as well as Pegasus Resources, LLC, GGM Exploration, Inc., TD Minerals LLC, and Tilden Capital Minerals, LLC (collectively, the KHH Appellees).

Although Powder River originally filed its lawsuit against Cimarex, the dispute is truly between the May Successors and the Chapman Successors; Cimarex is merely the operator who has agreed to pay the appropriate royalties to whomever owns the royalty interest.[3]

The parties' dispute distills down to whether, in all future leases, the Chapman-May Deed conveyed a fixed 3/128th royalty interest (the Chapman Successors' position) or a floating 3/16th royalty interest (the May Successors' position). The parties filed cross motions for summary judgment on that question and the record includes numerous responses and replies to those motions filed by various parties. The trial court granted summary judgment in favor of the Chapman Successors, and it denied Powder River's motion. The court then signed a final judgment determining that the May Successors own undivided interests in a 3/128th royalty interest in the subject mineral estate. Because we construe the Chapman-May Deed as conveying a "floating" 3/16th royalty interest, not a "fixed" 3/128th royalty interest, we reverse the trial court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The 1947 Chapman-May Deed

The parties do not dispute that, in 1947, N.F. Chapman and his wife, A.S. Chapman, conveyed to Jack May a royalty interest in the oil, gas, and other minerals in and under the subject property in Reeves County, Texas.[4] And while the parties agree that the Deed's language is unambiguous, they disagree about whether a fixed or floating royalty was conveyed. Specifically, the dispute centers on the first two paragraphs of the Deed, which we describe and reproduce in relevant parts below.

---

[3] Cimarex has gone so far as to call itself a "disinterested stakeholder" in this case. We agree that title to its leasehold interest is unaffected by the outcome of this case. Instead, this case will determine who Cimarex pays royalty to under its lease.

[4] The subject property is a complete section of land—640 acres—described as: "[a]ll of Section No. Seventeen (17) in Block No. Two (2) H&GN RR Company Survey, Reeves County, Texas."

To begin, the Deed was titled "ROYALTY DEED" and it begins with an opening line stating that the Chapmans have "GRANTED, BARGAINED, SOLD AND CONVEYED . . . unto the said Jack May of Reeves County, Texas, an undivided three sixteenths (3/16ths) interest in and to all the oil, gas and other minerals in and under that may be produced from the . . . described land . . . ."

Following this language, the first sentence of the second paragraph states that "[i]t is the intention of this instrument to convey to Grantee a royalty interest covering an undivided 120 acres, being an undivided 3/16ths of all the oil, gas and/or other minerals in and under the above described land, which interest shall not be chargeable with any production costs or expense." The second sentence of the paragraph next states that "[i]n the event the above land should be loaned for the mining of oil and gas or other minerals, then Grantees shall be entitled to receive under this conveyance free of cost in the pipe line to which any well or wells on said land may be connected, 3/16ths of one-eighth of all the oil and/or gas or other minerals produced therefrom under such lease."

### B. The parties' dispute and the trial court's judgment

Presently, the subject property is subject to a mineral lease that allows Cimarex, the lessee-operator, to produce the minerals in return for paying the mineral owners 25% of the minerals produced. The terms of the lease and the actual percentage of royalty under the lease are not disputed here. Cimarex has been paying royalties to the May Successors as if they collectively own only a 3/128th fixed royalty interest. The May Successors allege that Cimarex should instead be paying them 3/16ths of the one-quarter royalty provided for in the lease.

Powder River, one of the successors to the May interest, filed the underlying lawsuit alleging that Cimarex failed to pay Powder River its full share of the royalties. As stated above, Cimarex interpleaded a number of parties who are successors to the interests covered by the

4

Chapman-May Deed. Other successors later joined the lawsuit as well. The May Successors and the Chapman Successors filed cross motions for summary judgment on the issue of whether the Deed conveyed a fixed 3/128th royalty interest, as claimed by the Chapman Successors, or a floating 3/16th royalty interest, as asserted by the May Successors. The trial court agreed with the Chapman Successors—that is, that the Deed conveyed a fixed 3/128th royalty interest to May. This appeal followed that judgment.

## STANDARD OF REVIEW AND APPLICABLE LAW

### A. The standard of review

We review a trial court's grant of summary judgment de novo. *Eagle Oil & Gas Co. v. TRO-X, L.P.*, 619 S.W.3d 699, 705 (Tex. 2021). A traditional summary judgment is proper when a movant establishes that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c). When reviewing a traditional summary judgment, we take as true all evidence favorable to the nonmovant. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). When, as here, the parties file competing motions for summary judgment and the trial court grants one motion and denies the other, we consider the evidence presented by both sides, determine all questions presented, and render the judgment the trial court should have rendered. *Tex. Workers' Comp. Comm'n v. Patient Advocates of Tex.*, 136 S.W.3d 643, 648 (Tex. 2004).

### B. Deed interpretation principles

When construing an oil-and-gas deed, we apply the standard rules of contract interpretation. *Nettye Engler Energy, LP v. BlueStone Nat. Res. II, LLC*, 639 S.W.3d 682, 689 (Tex. 2022). If a deed can be given a certain or definite meaning, then the deed is not ambiguous. *Endeavor Energy Res., L.P. v. Discovery Operating, Inc.*, 554 S.W.3d 586, 601 (Tex. 2018). Ambiguity does not arise merely because parties assert differing interpretations. *N. Shore Energy,*

*L.L.C. v. Harkins*, 501 S.W.3d 598, 602 (Tex. 2016). Here, because the parties agree the deed is not ambiguous, we initially operate under an assumption that it is not. *See, e.g., Luckel v. White*, 819 S.W.2d 459, 461 (Tex. 1991); *Garret v. Dils Co.*, 299 S.W.2d 904, 907 (Tex. 1957).

The interpretation of an unambiguous deed is a question of law for the court. *Luckel*, 819 S.W.2d at 461. Our objective is to "'ascertain the true intentions of the parties as expressed in the writing itself,' beginning with the instrument's express language." *Nettye Engler*, 639 S.W.3d at 689 (quoting *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011). "To discern intent, words and phrases must be construed together and in context, not in isolation." *Hysaw v. Dawkins*, 483 S.W.3d 1, 13 (Tex. 2016). "Words and phrases generally bear their ordinary meaning unless the context supports a technical meaning or a different understanding. *Id*. As the Supreme Court of Texas has repeatedly affirmed, courts must attempt to ascertain the intent of a document from all parts of the document itself, construing the document as a whole and harmonizing any contradictions or inconsistencies. *See id*. As relevant here, however, a fundamental premise of ascertaining the ordinary meaning of a term is that "a text retains the same meaning today that it had when it was drafted." *Van Dyke*, 668 S.W.3d at 359. Lastly, we may consider facts and surrounding circumstances at the time of the instrument's execution but only to the extent they inform the instrument's text. *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 767 (Tex. 2018).

## C. Mineral estates, royalty interests, and the double fraction dilemma

"An instrument conveying land in fee simple transfers both the surface estate and all minerals and mineral rights, unless the instrument contains a reservation or expresses a contrary intention." *Hysaw*, 483 S.W.3d at 8. As well-established, the mineral estate includes five severable rights: "(1) the right to develop, (2) the right to lease, (3) the right to receive bonus payments, (4) the right to receive delay rentals, and (5) the right to receive royalty payments." *French v. Chevron*

6

*U.S.A. Inc.*, 896 S.W.2d 795, 797 (Tex. 1995). The owner of a present or future interest in the mineral estate may convey or reserve his or her mineral interest. *Luckel*, 819 S.W.2d at 464. A grantor need not part with all the attributes of his or her mineral estate, and "individual [rights or attributes] can be held back[] or reserved" by the grantor. *French*, 896 S.W.2d at 797. A royalty interest is defined as "a nonpossessory interest in minerals that may be separately alienated." *Luckel*, 819 S.W.2d at 463. Such an interest may be conveyed or reserved in one of two ways: as a fixed fraction of total production or as a fraction of the total royalty interest. *Hysaw*, 483 S.W.3d at 9. The former is known as a "fixed royalty" because it remains constant and is unrelated to the royalty amount in any particular oil and gas lease. *Id*. The latter is known as a "floating royalty" because it may vary over time depending on the royalty in effect under any given oil and gas lease. *Id*. Because of these two common types of royalties, the language used in the conveying or reserving instrument determines whether an interest is fixed or floating. *Id*.

It is well established that, at the time the parties executed the deed at issue, the term one-eighth as included in conveying instruments "did not typically bear its arithmetical meaning." *Van Dyke*, 668 S.W.3d at 362 (citing *Hysaw*, 483 S.W.3d at 8). Rather, this particular fraction, when viewed against a historical backdrop, was widely used as a term of art to refer to the total mineral estate or as a standard royalty. *Id*. (interpreting a 1924 deed's mineral reservation); *see also Hysaw*, 483 S.W.3d at 4 (construing a 1947 will's devise of a royalty interest). To be sure, it was not uncommon during that era for a lease to describe a floating royalty in terms of a double fraction, that is, a certain fraction of the usual 1/8th royalty. *See Graham v. Prochaska*, 429 S.W.3d 650, 657 (Tex. App.—San Antonio 2013, pet. denied). Because one-eighth language was commonplace in instruments of the period, the Supreme Court described that courts such as *Hysaw* expressly rejected "a mechanical approach requiring rote multiplication of double fractions whenever they exist." *Van Dyke*, 668 S.W.3d at 362 (citing *Hysaw*, 483 S.W.3d at 4). Instead, *Hysaw* held that

"[i]ntent must be determined by a careful and detailed examination of the document in its entirety, rather than by application of mechanical rules of construction that offer certainty at the expense of effectuating intent." *Hysaw*, 483 S.W.3d at 16. There, the Court found that the term "one-third of one-eighth royalty" did not intend to describe a 1/24 fractional royalty, but actually, a 1/3 fraction of royalty. *Id*.

Most recently, in *Van Dyke*, the Supreme Court more finely instructed that, when confronting a mineral reservation with a double fraction involving 1/8th, to "*begin* with a presumption that the mere use of such a double fraction was purposeful and that 1/8th reflects the *entire* mineral estate, not just 1/8th of it." *Van Dyke*, 668 S.W.3d at 364.[5] That is, the Court reaffirmed that *Hysaw* had recognized the need "to accord … significance to the use of double fractions in lieu of a single fraction." *Id*. (citing *Hysaw*, 483 S.W.3d at 10-12). As with all presumptions, however, this presumption may readily and genuinely be rebutted. "[E]very contract, deed, or will is free to manifest a different intent and to define terms in different ways." *Id*. The rebuttal of the presumption, however, must come from the instrument itself. *Id*.

## THE CHAPMAN-MAY DEED

### A.  The presumption applies

Here, like the instrument in *Hysaw*, we see a double fraction used in the context of a conveyance of a fractional royalty interest, with one of the fractions being 1/8th. Therefore, in conducting our analysis, the parties' intent must be determined by a careful and detailed examination of the document in its entirety, rather than by application of mechanical rules of construction that offer certainty at the expense of effectuating intent. *Van Dyke*, 668 S.W.3d at 363.

---

[5] As the Court noted, it would be odd to use a double fraction, such as 3/16 of one-eighth, if what was meant all along was a fixed 3/128th royalty. *Van Dyke v. Navigator Group*, 668 S.W.3d 353, 364 (Tex. 2023). Stated differently, if the parties intended a fixed royalty, the simplest and most precise language would be to simply state one fixed fraction. *See id*.

In that vein, *Van Dyke* recently reaffirmed that "[t]he near ubiquitous nature of the 1/8 royalty—dubbed by some as 'the legacy of the 1/8 royalty' or 'historical standardization' "—is something that "influenced the language used to describe the quantum of royalty in conveyances of a certain vintage." *Van Dyke*, 668 S.W.3d at 363 (quoting *Hysaw*, 483 S.W.3d at 9–10). As a result, "this prevalent belief and confusion resulted in parties mistakenly assuming the landowner's royalty would *always* be 1/8." *Id*. We thus presume at the outset that "the term 1/8 was used as a placeholder for future royalties *generally*—without anyone understanding that reference to set an arithmetical value." *Id*. To that end, we presume the parties operated under "the legacy of the 1/8 royalty" or "historical standardization," and thus, they intended a conveyance of a 3/16 floating royalty interest in the subject property. *See id.*

The Appellees urge that a presumption against a straight-forward mathematical approach should not apply for two reasons. First, they argue that while double-fraction deeds giving rise to confusion had begun to appear in the early-twentieth century, there is no expressly defined date where the confusion may be deemed to have been effectively cleared up. Appellees present the question of whether, for example, a 1960 instrument with double fractions should be subject to the same presumption that would be applied to a similar 1924 instrument. We note, however, that whether a 1960 instrument would be given the same presumption is not the issue presented here where we are confronted with a 1947 royalty deed. For sure, *Hysaw* itself interpreted a will from the same year at issue here. 483 S.W.3d at 5. While there may be an open question about deeds of a later vintage, it is clear based on *Hysaw*'s analysis and *Van Dyke*'s subsequent reliance on *Hysaw* that an instrument executed in 1947 does qualify for this presumption.

Second, Appellees point to a 1942 article written by Professor A.W. Walker, Jr., an oil and gas scholar and professor at the University of Texas School of Law. *See* A.W. Walker, Jr., *Oil Payments*, 20 Tex. L. Rev. 259, 273–74 (1942). Appellees argue that Walker's article, written five

years before the 1947 Deed was executed, explains why double fractions were used and what such words meant. We disagree with Appellees' characterization of Professor Walker's article for at least two reasons. First, the article more pointedly discussed "oil payments," which are a form of bonus payment belonging solely to the executive rights owner, not royalty interests as are at issue in this case. *Id*. at 259–60. Second, at any rate, one of the excerpts of the article that Appellees highlight advocates for the use of a **single fraction**—not a double fraction—when the intent is to create a fixed royalty interest:

> Frequently, grantors in reserving a royalty in a deed to land, or grantees purchasing a royalty under a nonparticipating royalty deed, stipulate that the royalty shall be a certain fixed fraction of all oil and gas produced. For example, **if one-half of the usual one-eighth royalty is contemplated, the parties will provide for a royalty of one-sixteenth** of all oil or gas produced. Under royalty reservations or royalty grants of this type the present problem [for NPRI owners caused by oil payments] could not arise.

*Id*. at 273 (emphasis added). The article itself shows that the most accurate way to describe a fixed royalty interest is to forego the double fraction and instead use a single fraction which has already been multiplied. *Id*. Professor Walker, in his article, goes on to state:

> On the other hand, the parties may provide for the right to a fraction, as one-half, of all the royalties payable under any existing or subsequent lease, and may . . . stipulate that no lease shall be executed wherein a royalty of less than the usual one-eighth shall be reserved. The very use of an instrument of this type calling for one-half of any royalties payable, rather than for a royalty of one-sixteenth of the production, would seem to indicate the intention of the parties that the royalty owner is to share in any royalty greater than the usual one-eighth for which the land may be leased.

*Id*. at 273–74. In short, Professor Walker did not advocate for the use of double fractions to create fixed royalty interests, as Appellees suggest. Rather, he pointed out the exact opposite: that a double fraction—such as one-half of one-eighth in Professor Walker's example, or 3/16 of one-eighth as was used in the 1947 Deed at issue here—would tend to show an intent for the royalty owner to share in any future royalty that may be greater than the usual one-eighth.

For these reasons, we determine that *Hysaw's* initial recognition of the legacy of the 1/8th royalty applies to the 1947 Deed. We now turn to the text of the Deed in search of any language that would rebut that determination.

**B. The presumption of the use of a historical standardization is only confirmed—not rebutted—by the language in the 1947 Deed.**

Here, after examining the entire instrument, it confirms the presumption that a floating royalty interest was conveyed. First, the granting clause of the Deed does not use a double fraction at all; instead, it conveys a three-sixteenths "interest in and to all the oil, gas and other minerals in and under and that may be produced from" the subject property. This broad grant cannot be harmonized with the double fraction found in the second paragraph if the intent of the double fraction were to only convey a 3/128 fixed royalty.

Similarly, the opening provision of that second paragraph states again the intention of the conveyance without using any double fraction:

> It is the intention of this instrument to convey to Grantee a royalty interest covering an undivided 120 acres, being an undivided 3/16ths of all the oil, gas and/or other minerals in and under the above described land, which interest shall not be chargeable with any production costs or expense.

Like the language in the granting clause, this provision could not be harmonized with the remainder of the paragraph, which includes the double fraction, if the intent of the double fraction was to create a fixed 3/128 royalty.

Appellees argue that the presumption is rebutted in several ways. First, Appellees attempt to draw a distinction between this case and *Van Dyke* in that the instrument in that case was a conveyance of the minerals with a reservation of the royalty interest at issue, whereas in this case the instrument was a conveyance of the royalty interest. While that is a valid distinction, it makes no difference. A royalty interest may be created by the conveyance of that royalty interest to the grantee (as was done here) or by a broad conveyance of the minerals along with a reservation of a

11

royalty interest (as was done in *Van Dyke*). *Luckel*, 819 S.W.2d at 464 (holding that an interest in minerals can be created by a conveyance or reservation); *Hysaw*, 483 S.W.3d at 9 (same). Both methods would create the same interest, with one being conveyed to the grantee and one being withheld by the grantor. And each type of instrument is subject to the same legal rules for construction. *Luckel*, 819 S.W.2d at 464.

Next, Appellees argue that the royalty conveyance was only applicable "[i]n the event" the subject property was leased for minerals. We disagree. The deed conveyed an interest in all future royalties that was effective upon execution. Simply because the grantee would not technically receive royalty payments until oil and gas was produced does nothing to change the fact that ownership of the interest was conveyed by the Deed.

Finally, Appellees argue that the double fraction language itself rebuts the presumption. This argument is circular; the reason the presumption exists is because of the confusion surrounding the nature of mineral interests and royalties in the early-to-mid-twentieth century and the resulting use of double fractions involving the usual one-eighth royalty. While Appellees argue that the double fraction "steadfastly and unequivocally conveyed a fixed 3/128 royalty," *Hysaw* and *Van Dyke* stand for the complete opposite outcome, unless some ***other*** language in the Deed manifests an intention to convey a fixed royalty.

Consequently, we conclude that Appellees have not identified any language within the Deed itself which would rebut the presumption that the intent of the double fraction was to convey a floating royalty interest. On the contrary, as we explained above, other language in the Deed confirms the presumption.

## CONCLUSION

We conclude that the Chapman-May Deed conveyed a floating 3/16 royalty interest in the subject property in favor of May. As a result, each of the May Successors own their proportional

share of that floating royalty interest. Because the trial court held otherwise, we reverse its judgment and remand for further proceedings.

GINA M. PALAFOX, Justice

December 15, 2023

Before, Palafox, and Soto, JJ., and Marion, C.J. (Ret.)
Marion, C.J. (Ret.), sitting by assignment