**Opinion filed February 27, 2026**



In The

# Eleventh Court of Appeals

_____

## No. 11-24-00007-CV

_____

**THE NAVIGATOR GROUP ET AL., Appellants**

**V.**

**SUSAN DAVIS VAN DYKE ET AL., Appellees**

**On Appeal from the 118th District Court**

**Martin County, Texas**

**Trial Court Cause No. 6668**

## O P I N I O N

In this matter, we revisit a familiar dispute involving a 1924 deed in which George H. Mulkey and Frances E. Mulkey conveyed property to G.R. White and G.W. Tom while reserving to themselves "one-half of one-eighth" of the "minerals and mineral rights" therein. The dispute centers on whether "one-half of one-eighth" should be interpreted as a mathematical expression, reserving only one-sixteenth of

the minerals, or whether the true intent of the grantors was to reserve one-half of their mineral interests in the 1924 deed.

The parties are divided into two sides. Appellants are the successors to G.R. White and G.W. Tom (the White successors).[1] Appellees are the successors to the Mulkeys (the Mulkey successors).[2]

We first addressed this case in 2020, erroneously holding that "by the plain language of the reservation, the Mulkeys reserved a one-sixteenth interest in the minerals and mineral rights." *Van Dyke v. Navigator Grp.*, 647 S.W.3d 901, 908 (Tex. App.—Eastland 2020) (*Van Dyke I*), *rev'd*, 668 S.W.3d 353 (Tex. 2023) (*Van Dyke II*). Subsequently, however, the Texas Supreme Court determined that "the

---

[1]Appellants are Blake Oil & Gas Corp.; Jack E. Blake, Jr.; Rick Ybarra, as Trustee of the Logan Lee Blake Trust; Betty Lou Angelo; Ernest Angelo, Jr.; S. Javaid Anwar; Brendan J. Fikes Family P'ship, Ltd.; Navigator Oil & Minerals, Inc.; Michael J. Daniel; Dingus Investments, Inc.; Discovery Exploration P'ship; MTX Interests, L.P.; Kennedy Minerals, Ltd.; The Ninety-Six Corp.; Keith M. Skaar; Blake Wood (the "Navigator Group"); and JPMorgan Chase, N.A., as Trustee of the G.R. White Charitable Trust and the Joy Lina White Ubina Trust.

[2]Appellees are Susan Davis Van Dyke; Estate of Stephen L. Davis, Deceased; Sheryl Ann Huttner, f/k/a Ann Mulkey Bell; Estate of Kay Elaine Keys, Deceased; Jill Marie Stuckert, a/k/a Jill Marie Walker; George Dan Mulkey and Thomas J. Mulkey, Trustees of the Mulkey Family Mineral Trust; Arthur B. Davis; Boyd Enterprises, Inc.; The Huffington Foundation; Bishop-Windham Family Limited Partnership; The Dillon Fund; Terry S. Key, Trustee of the Terry S. Key Non-Exempt Trust; Roger A. Key, Trustee of the Roger A. Key Non- Exempt Trust; Pam Stribling and John V. Price as Heirs and Successors of Interest to Noble H. Price; Preston Bridgewater, Jr.; James G. McClellan, Ind. Executor of Estate of Hayden J. Upchurch, Deceased; Deborah L. Alexander, Trustee of the DLA Child's Trust; Amanda Kay Livingston, Trustee of the AKL Child's Trust; Culley Ingram, Trustee of the CI Grandchild's Trust; Kerry Kantman, Trustee of the KK Grandchild's Trust; McKenzie Ciliberto, Trustee of the MC Grandchild's Trust; Ryedale, LLC; Jane R. Lancaster; Raymond James Trust, N.A., Trustees of the Edith Elizabeth Brasher 1986 Management Trust; William Marsh Rice University; Howard W. Key, Trustee of the Howard W. Key Non-Exempt Trust; Charles E. Key, Trustee of the Charles E. Key Non-Exempt Trust; G&R Carr Enterprises, LLC; Dorchester Minerals, LP; Deutsche Bank Trust Company, N.A. and Irving Sitnick, Trustees of the Lucy G. Moses 12/24/58 Trust; Deutsche Bank Trust Company, N.A., Trustee of the Henry & Lucy Moses Foundation Trust; Deutsche Bank Trust Company, N.A. and William H. Hernstadt, Trustees of the William H. Hernstadt Estate Trust; Deutsche Bank Trust Company, N.A., Trustee of the William L. Hernstadt 1937 Trust; Freeport-McMoRan Oil & Gas LLC; PXP Producing Company LLC; Renee Brunson; Gary Covington; Kyle Covington; Lisa Graham; Kirk Covington; Earmark Enterprises; Dela Minerals, Inc. by and through Covington Minerals, LP; Endeavor Energy Resources, LP; Dave Michael McCullar; Frederick Bartlett Wulff, Sr.; Richard W. Winters, Jr.; and Kathleen M. Winters.

Mulkey parties hold title to 1/2 of the mineral estate." *Van Dyke v. Navigator Grp.*, 668 S.W.3d 353, 368 (Tex. 2023). However, the Texas Supreme Court did not render judgment. *Id.* Instead, it remanded the case to the trial court for further proceedings.[3] *Id.* On remand, the trial court signed a judgment holding, among other things, that "the Mulkeys reserved to themselves . . . an undivided 1/2 of the entire mineral estate."

In this appeal, the White successors argue that the trial court misapplied *Van Dyke II* when it failed to distinguish the reservation of the Mulkey's right to royalties (which they argue is one-sixteenth) from their remaining mineral rights (which they argue is one-half). Alternatively, the White successors urge us to disregard the supreme court's opinion in *Van Dyke II* and hold that the deed reserves "a fixed 1/16th royalty interest."

We conclude that the trial court has correctly applied *Van Dyke II* in its judgment and that we are obliged to adhere to *Van Dyke II* under the doctrines of stare decisis and the law of the case. *See Lubbock Cnty., Tex. v. Trammel's Lubbock Bail Bonds*, 80 S.W.3d 580, 585 (Tex. 2002); *Briscoe v. Goodmark Corp.*, 102 S.W.3d 714, 716 (Tex. 2003). Accordingly, we affirm the judgment of the trial court.

*Factual and Procedural Background*

The reservation clause at issue involves the mineral rights to a ranch property that is situated in Howard and Martin Counties. It provided as follows:

> It is understood and agreed that one-half of one-eighth of all minerals and mineral rights in said land are reserved in grantors, Geo. H. Mulkey and Frances E. Mulkey, and are not conveyed herein.

---

[3]The Texas Supreme Court noted that a remand was necessary because the Mulkey successors did not have a motion for summary judgment before the trial court with respect to the construction of the 1924 deed. *Van Dyke II*, 668 S.W.3d at 368 n.12.

3

For the last twelve years, the parties have clashed over the question of whether the language at issue reserved to the Mulkeys one-sixteenth or one-half of the mineral rights in the property. *See Van Dyke II*, 668 S.W.3d at 357; *Van Dyke I*, 647 S.W.3d at 905.

In 2018, the trial court issued an order holding that the language at issue reserved a one-sixteenth interest in the mineral rights to the property. Several months later, we affirmed. *Van Dyke I*, 647 S.W.3d at 913. However, the supreme court subsequently reversed our judgment, holding that the deed reserved one-half of the mineral estate and remanding the case to the trial court for further proceedings. *Van Dyke II*, 668 S.W.3d at 368.

On remand, the trial court entered a final judgment, holding, among other things, that the Mulkeys had reserved one-half of the entire mineral estate, and that the successors-in-interest to the Mulkeys therefore held title to an undivided one-half of the entire mineral estate.

The White successors now appeal from the trial court's judgment on remand, asserting that the trial court erred in holding that the deed reserved an undivided one-half of the *entire* mineral estate (including one-half of the royalties). As set out below, the White successors make a distinction between ownership of the relevant royalty interest and ownership of the minerals and other mineral rights. They contend that while the Mulkeys intended to reserve one-half of the minerals in the 1924 deed as per *Van Dyke II*, they also intended to reserve in the 1924 deed a fixed one-sixteenth of the royalty interest.

*The White Successors' Challenge to the Trial Court's Judgment*

In their first issue, the White successors assert that the trial court erred when it declared that the 1924 deed reserved "an undivided 1/2 of the entire mineral estate" to the Mulkeys. In support of this claim, they argue that the trial court's ruling is

4

inconsistent with the supreme court's opinion in *Van Dyke II*. Alternatively, they argue that, if we determine that the trial court's judgment is consistent with *Van Dyke II*, we should reverse the trial court's ruling on the grounds that *Van Dyke II* was wrongly decided.

*Estate Misconception and Historical Standardization*

The White successors' first argument relies on the rules of interpretation for antiquated deeds set forth in *Van Dyke II*. That case began with the well-established premise that courts should adopt the ordinary meaning of a word "[u]nless otherwise defined in the text." *Id.* at 359. More specifically, courts should adhere to the "meaning at the time of drafting." *Id.* at 360; *see also Hysaw v. Dawkins*, 483 S.W.3d 1 (Tex. 2016) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 78 (2012)). Thus, "[t]he test is what the text reasonably meant to an ordinary speaker of the language who would have understood the original text in its context." *Van Dyke II*, 668 S.W.3d at 360.

With these principles in mind, the supreme court then examined the "Double-Fraction Dilemma," which it had previously visited in *Hysaw*. *Id.* at 362. When a deed consistently uses single fractions to describe an interest, the determination of the interest at issue will ordinarily be a simple matter. *Id.*; *Hysaw*, 483 S.W.3d at 9. However, when a deed describes an interest as a double-fraction, it can "present serious complications." *Van Dyke II*, 668 S.W.3d at 362. Should the double-fraction be treated as if it were a simple (but seemingly unnecessary) problem of arithmetic? Or should we restrain our instincts to reduce the two fractions to a single numerical expression and consider whether they might have a different meaning? In both *Hysaw* and *Van Dyke II*, the supreme court took the latter path, finding that "[i]ntent must be determined by a careful and detailed examination of the document in its entirety, rather than by application of mechanical rules of construction that offer

5

certainty at the expense of effectuating intent." *Id.* (quoting *Hysaw*, 483 S.W.3d at 16). Specifically, the court found that, in the context of antiquated deeds, there were "two widespread and related faulty conceptual culprits . . . that worked in tandem to lead parties to use the term '1/8' to describe something other than a literal eighth." *Id.* at 363. Those concepts are the estate misconception theory and the historical standardization of the term "1/8" (also sometimes described as "the legacy of the 1/8 royalty"). *Id.* at 363.

"The estate-misconception theory reflects the prevalent (but, as it turns out, mistaken) belief that, in entering into an oil-and-gas lease, a lessor retained only a 1/8 interest in the minerals rather than the entire mineral estate in fee simple determinable with the possibility of reverter of the entire estate." *Id.* (citing *Hysaw*, 483 S.W.3d at 10). Thus, grantors often mistakenly used the term "1/8" to refer to the entirety of their mineral interest. *Id.*

In a similar manner, the court found that the term "1/8" had acquired a special meaning in the context of a standard royalty, since the use of a 1/8 royalty was "near ubiquitous" at the time. *Id.* (quoting *Hysaw*, 483 S.W.3d at 9–10). Thus, "parties would use the term 1/8 as a placeholder for future royalties *generally*—without anyone understanding that reference to set an arithmetic value." *Id.*

Based on these principles, the court determined in both *Van Dyke II* and *Hysaw* that, under the facts presented in those cases, the term "1/8" was properly understood as a description of the entire mineral estate. *Id.* at 364; *Hysaw*, 483 S.W.3d at 15–16. Furthermore, based on this determination, the court in *Van Dyke II* concluded "that the Mulkey parties hold title to 1/2 of the mineral estate." *Van Dyke II*, 668 S.W.3d at 368.

*Did the Mulkey's Reserve Only a 1/16th fixed Royalty Interest?*

In this appeal, the White successors argue that, in determining that "the Mulkeys reserved . . . an undivided 1/2 of the entire mineral estate," the trial court erred in its implementation of *Van Dyke II*. Specifically, they contend that, to maintain consistency with *Van Dyke II*, the trial court should have held that "the Mulkeys reserved a 1/2 mineral interest (excepting as to royalties) and a fixed 1/16 royalty interest." In this regard, the White successors contend that if the prevalent belief at the time was that a royalty interest would aways be one-eighth, then it "informs the quantum of royalty the Mulkeys actually intended to reserve" in the 1924 deed.[4]

We review a trial court's construction of a deed de novo. *See Piranha Partners v. Neuhoff*, 596 S.W.3d 740, 743 (Tex. 2020); *Pacer Energy, Ltd. v. Endeavor Energy Res.*, LP, 675 S.W.3d 390, 394 (Tex. App.—Eastland 2023, pet. denied). An appellate court may only construe a deed as a matter of law if it is unambiguous. *ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 874 (Tex. 2018) (citing *J. Hiram Moore, Ltd. v. Greer*, 172 S.W.3d 609, 613 (Tex. 2005)). If a deed is worded in such a way that it can be given a certain or definite legal meaning, then the deed is not ambiguous. *Endeavor Energy Res., L.P. v. Discovery Operating, Inc.*, 554 S.W.3d 586, 601 (Tex. 2018). Our task when construing an unambiguous deed is to "ascertain the intent of the parties from all of the language in the deed" as

---

[4]As asserted by the White successors in their brief:

> If the Mulkeys believed future lease royalties would always be 1/8, they believed they would always be entitled to a 1/8 payment on the leased minerals—no matter how much of the minerals were actually leased therein (whether 1/2, 1/8, 1/16, or some other fraction of the minerals). So, by contracting in a manner to reserve only "one-half of one-eighth" of mineral rights, the legacy misconception informs that the Mulkeys' intent was to reserve a 1/16 payment on the leased minerals— no matter how much of the minerals were ultimately leased.

expressed within the "four corners" of the instrument. *Luckel v. White*, 819 S.W.2d 459, 461 (Tex. 1991); *Pacer*, 675 S.W.3d at 394. The four-corners rule requires the court to ascertain the intent of the parties solely from all of the language in the deed. *Wenske v. Ealy*, 521 S.W.3d 791, 794 (Tex. 2017) (citing *Luckel*, 819 S.W.2d at 461). The intent that governs is not the intent that the parties meant but failed to express but, rather, the intent that is expressed. *Luckel*, 819 S.W.2d at 462.

A mineral estate consists of five interests: "1) the right to develop, 2) the right to lease, 3) the right to receive bonus payments, 4) the right to receive delay rentals, and 5) the right to receive royalty payments." *Hysaw*, 483 S.W.3d at 9(quoting *French v. Chevron U.S.A. Inc.*, 896 S.W.2d 795, 797 (Tex.1995)). As noted by a legal commentator, of the five "sticks" in "the bundle" of mineral interests, "[r]oyalty is likely the most litigated stick within the bundle." Christopher Kulander, "'Fixed vs. Floating' Mineral and Royalty Questions in Texas: Is the End Any Nearer?" *Law of Permian Basin Oil & Gas Development and Operations* 6B-1, 6B 1 (Found. for Nat. Res. & Energy L. 2023).

The nature of an interest conveyed or reserved by a deed is ascertained from the language of the deed itself. *See Pacer*, 675 S.W.3d at 395 (citing *Endeavor Energy Res., LP v. Trudy Jane Anderson Testamentary Tr., by & Through Anderson*, 644 S.W.3d 212, 223–24 (Tex. App.—Eastland 2022, pet. denied)). Here, the Mulkeys reserved to themselves "one-half of one-eighth" of the "minerals and mineral rights" therein. Of course, our task of interpreting the 1924 deed is guided by the Texas Supreme Court's holding in *Van Dyke II* wherein it determined that the Mulkeys reserved "1/2 of the mineral estate" in the 1924 deed. 668 S.W.3d at 368. The White successors' argument on appeal goes one step further than the holding in *Van Dyke II*. They assert that, in addition to reserving one-half of the mineral estate, the Mulkeys also reserved a fixed one-sixteenth royalty interest. The White

successors contend that this additional reading of the 1924 deed is required by *Van Dyke II*.

The White successors argue that the court in *Van Dyke II* was signaling that the parties' rights to royalties should be treated as a separate matter from the rights to the remainder of the mineral estate. They base this argument on the assertion that the *Van Dyke II* opinion treated the estate misconception theory and the historical standardization of royalties as "distinct" and "separate" issues.

The White successors agree that, under the estate misconception theory, landowners such as the Mulkeys might have erroneously believed that if the land was leased for development in the future, they "retained only 1/8 of the minerals in place . . . instead of a fee simple determinable with the possibility of reverter in the entirety." *See Hysaw*, 483 S.W.3d at 10. Thus, they concede that the trial court's judgment with respect to ownership of the mineral estate is consistent with the portion of the *Van Dyke II* opinion that assesses the parties' rights under the estate misconception theory. However, they argue that the trial court's judgment does not correctly dispose of the parties' royalty rights, which—according to the White successors—the supreme court treated as a separate issue in its analysis of the legacy of the 1/8 royalty.

The White successors assert that the estate misconception theory and the legacy of the 1/8 royalty do not operate in the same manner. They argue that "[u]nlike the estate misconception whereby the Mulkeys believed their actual mineral ownership changed from 8/8 to 1/8, the royalty misconception presumes that the Mulkeys believed the royalty was forever 1/8." They maintain that "by laboring under this royalty misconception, [they] know the Mulkeys' actual intent was to reserve a fixed 1/16 royalty" as a result of the 1924 deed.

9

Under the language of the 1924 deed, the Mulkeys reserved one-half of the "minerals and mineral rights." The Texas Supreme Court shortened the term to "mineral estate" in its holding. *Van Dyke II*, 668 S.W.3d at 368. As we noted in *Pacer*, the Texas Supreme Court recognized in the 1937 case of *Schlittler v. Smith* that the terms "minerals" and "mineral rights" are synonymous as references to the mineral estate, i.e. the minerals in place. *Pacer*, 675 S.W.3d at 395 (citing *Schlittler v. Smith*, 101 S.W.2d 543, 544 (Tex. 1937)). We also commented in *Pacer* that the reservation in *Van Dyke II* was a reservation of a portion of the mineral estate. *Id.* (citing *Van Dyke II*, 668 S.W.3d at 357–58).

"A royalty interest is an interest in land that is a part of the total mineral estate . . . [that] derives from the grantor's mineral interest." *Luckel*, 819 S.W.2d at 463 (citing *State National Bank v. Morgan*, 143 S.W.2d 757, 760 (Tex. 1940)). "Generally, 'the conveyance of an interest in the minerals in place carries with it by operation of law the right to a corresponding interest in the royalty.'" *Wenske*, 521 S.W.3d at 797 (quoting *Woods v. Sims*, 273 S.W.2d 617, 621 (Tex. 1954)). Thus, "when a deed conveys or reserves a 3/8ths interest in the minerals, the nature of that interest, by operation of law, includes the right to receive 3/8ths of the royalties." *Id.* (citing *Woods*, 273 S.W.2d at 621).

The Texas Supreme Court determined in *Van Dyke II* that "the Mulkey parties hold title to 1/2 of the mineral estate" without further qualification. 668 S.W.3d at 368. In doing so, the court was referring to the *entire* set of severable mineral rights attributable to one-half of the mineral estate, including the corresponding right to royalties, rather than (as the White successors contend) all of the mineral rights *except* the royalties. *See Wenske*, 521 S.W.3d at 797.

In the 1924 deed, the Mulkeys reserved one-half of the mineral estate. There was no severance or "carve out" in the 1924 deed of their royalty interest or any

10

other party's royalty interest from the mineral estate. Accordingly, the trial court did not err by rejecting the White successors' contention that the Mulkeys reserved in the 1924 deed a fixed one-sixteenth royalty interest. Thus, the statement by the trial court in its judgment that the Mulkeys reserved "an undivided 1/2 of the entire mineral estate in, to and under the lands described in the 1924 Deed" merely reiterates the supreme court's holding in *Van Dyke II* in only slightly different wording. *Van Dyke II*, 668 S.W.3d at 368.

The alternative reading proposed by the White successors is inconsistent with the supreme court's framing of the issues in *Van Dyke II*. When describing the issues before it, the court indicated that "the ownership of [past] (and presumably future) royalties turns on which side correctly interprets the deed's mineral reservation." *Id.* As such, it appears that the supreme court believed that its interpretation of the mineral reservation in the 1924 deed would also be dispositive of the disposition of the royalties. There is no explicit suggestion in *Van Dyke II* that the supreme court somehow intended a result that treated the parties' royalty rights in any way that was distinct from the remaining mineral rights, and we do not believe that the court would have merely inferred such a result, since it believed that the disposition of the ownership of the royalty rights was the primary matter that was at stake. *Id*.

Moreover, contrary to *Hysaw* and *Van Dyke II*, the alternative reading proposed by the White successors fails to harmonize the relationship between the estate misconception theory and the legacy of the 1/8 royalty. In both cases, the supreme court indicated that the estate misconception theory and the legacy of the 1/8 royalty are interrelated concepts that work together toward the same result. *Hysaw*, 483 S.W.3d at 10 ("A related issue that may be implicated in double-fraction cases is the theory of 'estate misconception.'"); *see Van Dyke II*, 668 S.W.3d at 362 (In *Hysaw*, "[t]he court identified two related circumstances that explain why 1/8 in

11

such instruments did not typically bear its arithmetical meaning: the historical use of 1/8 as the standard royalty and the estate-misconception theory."). The White successors' suggestion that these two concepts somehow cut against each other, producing different outcomes for different types of mineral interests, is inconsistent with the supreme court's more straightforward understanding.

The White successors' interpretation of the reservation clause in light of *Van Dyke II* invites us to read the phrase "one-eighth of all minerals and mineral rights in said land" as carrying two different meanings at once. According to the White successors' interpretation, "one-eighth" is supposed to refer to the entire mineral estate in a manner that is consistent with the estate misconception theory. However, at the same time, it is supposed to refer to a fixed 1/8th of only the royalties. While grantors are free to distinguish between their disposition of royalty interests and other mineral interests, *see Hysaw*, 483 S.W.3d at 9, it is unreasonable to assume that a grantor would attempt to do both within the same reservation clause, and we do not believe that the supreme court intended such a result in *Van Dyke II*. The supreme court has plainly stated that "this deed did not use 1/8 in its arithmetical sense." *Van Dyke II*, 368 S.W.3d at 366. As such, under *Van Dyke II*, the parties' use of the phrase "one-eighth of all minerals and mineral rights in said land" did not serve as a multiplier to be applied to the mineral rights as a whole for the creation of a royalty interest. Simply put, the 1924 deed did not create a royalty interest.

For these reasons, we reject the White successors' argument that, under the principles enunciated in *Van Dyke II*, the 1924 deed reserved to the Mulkeys only 1/16th of the royalties.

12

*Stare Decisis and the Law of the Case*

As a part of their first issue, the White successors argue in the alternative that *Van Dyke II* was wrongly decided and that we should therefore "right a wrongly-decided case." We decline to take this extraordinary step for two reasons.

A. *Stare Decisis Compels Us to Honor Van Dyke II*

"Adherence to precedent [is] the touchstone of a neutral legal system that provides stability and reliability." *Mitschke v. Borromeo*, 645 S.W.3d 251, 263 (Tex. 2022). For that reason, "[d]epartures from precedent must be carefully considered and should be rare." *Id.* Courts will therefore adhere to their precedents for purposes of efficiency, fairness, and legitimacy. *Id.*

"[E]fficiency" is promoted when emerging disputes are clearly resolved by the precedent. *See id.* If courts do not follow their own decisions, "no issue could ever be considered resolved," and "[t]he potential volume of speculative relitigation" rises. *Weiner v. Wasson*, 900 S.W.2d 316, 320 (Tex. 1995).

In the context of precedent, "fairness" is promoted when parties can share settled expectations and justifiably rely on the rulings of the court when they make decisions about future courses of action. *Weiner*, 900 S.W.2d at 320; *see also Grapevine Excavation, Inc. v. Maryland Lloyds*, 35 S.W.3d 1, 5 (Tex. 2000) (Stare decisis "results in predictability in the law, which allows people to rationally order their conduct and affairs.").

Finally, the purpose of "legitimacy" is served by a "stable and predictable decisionmaking process" that contrasts with (and, to some degree, counterbalances) the "political" branches of government, which are more appropriately prone to change. *See Weiner*, 900 S.W.2d at 320 ("[Stare decisis] permits society to presume that bedrock principles are founded in the law rather than in the proclivities of individuals, and thereby contributes to the integrity of our constitutional system of

13

government, both in appearance and in fact." (quoting *Vasquez v. Hillery*, 474 U.S. 254, 265–66 (1986))).

Stare decisis is the central pillar that supports our system of precedent. It dictates that "once the supreme court announces a proposition of law, the decision is considered binding." *Trammel's*, 80 S.W.3d at 585; *see also Sw. Bell Tel. Co., L.P. v. Mitchell*, 276 S.W.3d 443, 447 (Tex. 2008). Pursuant to the doctrine of stare decisis, only the Texas Supreme Court can abrogate its established precedent. *Robinson v. Home Owners Mgmt. Enterprises, Inc.*, 590 S.W.3d 518, 528 (Tex. 2019). By contrast, "[i]t is not the function of a court of appeals to abrogate or modify established precedent" of the Texas Supreme Court. *Trammel's*, 80 S.W.3d at 585; *see Swilley v. McCain*, 374 S.W.2d 871, 875 (Tex. 1964) ("After a principle, rule or proposition of law has been squarely decided by the Supreme Court, or the highest court of the State having jurisdiction of the particular case, the decision is accepted as a binding precedent by the same court or other courts of lower rank when the very point is again presented in a subsequent suit between different parties."); *State v. Standard*, 401 S.W.2d 363, 365 (Tex. App.—Eastland 1966), *rev'd on other grounds*, 414 S.W.2d 148 (Tex. 1967) (quoting *Swilley*); *see also In re State Farm Mut. Auto. Ins. Co.*, 614 S.W.3d 316, 360 (Tex. App.—Fort Worth 2020, orig. proceeding).

The White successors correctly point out that stare decisis is not an absolute principle, and that courts can and should overrule precedent when it no longer serves the purposes of efficiency, fairness, and legitimacy. *See, e.g.*, *Mitchell*, 276 S.W.3d at 448 ("[J]udicial adherence to the decision in the name of stare decisis may actually disserve the interests of 'efficiency, fairness, and legitimacy' that support the doctrine."). However, the White successors' request for this court to overturn *Van Dyke II* in the face of stare decisis is misdirected. *Van Dyke II* is a decision that was

14

handed down by the Texas Supreme Court.  As such, any decision to overrule it must likewise be made by the Texas Supreme Court.  *See Robinson*, 590 S.W.3d at 528. Contrary to the White successors' request, the doctrine of stare decisis compels us to follow, rather than reject, *Van Dyke II*.  *See Trammel's*, 80 S.W.3d at 585.

B. *The Law of the Case Compels us to Follow Van Dyke II*

We are also compelled to follow *Van Dyke II* as law of the case.

The law of the case can be expressed as "that principle under which questions of law decided on appeal to a court of last resort will govern the case throughout its subsequent stages." *Briscoe*, 102 S.W.3d at 716 (quoting *Hudson v. Wakefield*, 711 S.W.2d 628, 630 (Tex. 1986)).  As such, "the issues decided on appeal will be regarded as the law of the case and thus govern the case throughout its subsequent stages." *Eriksen v. Nelson*, 708 S.W.3d 302, 309 (Tex. App. —15th Dist. 2025, no pet.).

Like stare decisis, the law of the case favors adherence to precedent. It operates to "achieve uniformity of decision as well as judicial economy and efficiency." *Hudson*, 711 S.W.2d at 630; *see also Deaton v. Law Offices of Steven M. Johnson, P.C.*, 697 S.W.3d 676, 694 (Tex. App.—Eastland 2024, no pet.).  It furthers such purposes by, among other things, encouraging an end to litigation that might otherwise continue indefinitely. *Id.*

When a court of appeals makes a determination on a matter of law, its decision is likewise binding on remand. *See, e.g.*, *Paradigm Oil, Inc. v. Retamco Operating, Inc.*, 372 S.W.3d 177, 182 (Tex. 2012); *Hjella v. Red McCombs Motors, Ltd.*, No. 04-23-00145-CV, 2024 WL 3954214, at *2 (Tex. App.—San Antonio Aug. 28, 2024, no pet.) (mem. op.) (The doctrine of the law of the case "may apply even when the appeal does not reach the court of last resort.").  However, this principle applies only in situations where the Texas Supreme Court has not ruled on the matter at

issue. *City of Houston v. Precast Structures, Inc.*, 60 S.W.3d 331, 338 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) ("Where a losing party fails to avail itself of an appeal in the court of last resort, but allows the case to be remanded for further proceedings, the points decided by the court of appeals will be regarded as the law of the case and will not be re-examined.").

Although the law of the case doctrine provides us with discretion to reconsider our own decisions on matters of law, *see Briscoe*, 102 S.W.3d at 716–17, we cannot do so with respect to decisions that have been made by the supreme court. Such decisions are binding on us, just as they are binding on the trial court. *See Briscoe*, 102 S.W.3d at 716 ("[Q]uestions of law decided on appeal to a court of last resort will govern the case throughout its subsequent stages." (quoting *Hudson*, 711 S.W.2d at 630)). Accordingly, in accordance with the doctrine of the law of the case, we decline to reconsider the Texas Supreme Court's decision in *Van Dyke II*.

We overrule the White successors' first issue.

### The Presumed Grant Doctrine

In their second issue, the White successors argue that the Mulkey successors are not entitled to receive more than a fixed one-sixteenth royalty under the presumed grant doctrine. *See Van Dyke II*, 668 S.W.3d at 366–68 (discussion of the applicability of the presumed-grant doctrine). As explained in *Van Dyke II*, the presumed grant doctrine has been referred to as "title by circumstantial evidence" and it has been described as "a common law form of adverse possession." *Id.* at 366 (quoting *Fair v. Arp Club Lake, Inc.*, 437 S.W.3d 619, 626 (Tex. App.—Tyler 2014, no pet.)). As applied to the facts in this case, if the Mulkeys had only obtained a one-sixteenth interest in the mineral estate by virtue of the 1924 deed, then they subsequently acquired the remaining seven-sixteenth interest as evidenced by the parties' subsequent dealings. *Id.* The Texas Supreme Court concluded that the

Mulkey successors also established title under the presumed grant doctrine to the disputed seven-sixteenth interest in the mineral estate. *Id.* at 366–68.

The Mulkey successors included the presumed grant doctrine as a ground for summary judgment. Because the trial court's order does not specify the grounds for its summary judgment, we must affirm the summary judgment if any of the theories presented to the trial court and preserved for appellate review are meritorious. *See Provident Life & Acc. Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003) (first citing *Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 626 (Tex. 1996); and then citing *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex. 1989)). Accordingly, the White successors challenge the summary judgment to the extent that it was granted under the presumed grant doctrine. *See Star-Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex. 1995) ("When the trial court does not specify the basis for its summary judgment, the appealing party must show it is error to base it on any ground asserted in the motion.").

As set forth above, we have concluded that, under the express terms of the 1924 deed, the Mulkeys reserved a one-half interest in the mineral estate without any reference to the creation or reservation of a royalty interest. Specifically, the 1924 deed did not reserve a fixed one-sixteenth royalty interest as asserted by the White successors. In light of our conclusion that summary judgment was proper on the ground that the Mulkeys reserved a one-half interest in the mineral estate under the express terms of the 1924 deed, we need not address the alternative ground of the presumed-grant doctrine. *See State v. Ninety Thousand Two Hundred Thirty–Five Dollars & No Cents in U.S. Currency ($90,235)*, 390 S.W.3d 289, 294 (Tex. 2013) (court of appeals did not need to discuss alternative grounds for summary judgment after upholding summary judgment on one meritorious ground).

We overrule the White successors' second issue.

17

*This Court's Ruling*

For the reasons stated, we affirm the judgment of the trial court.


JOHN M. BAILEY

CHIEF JUSTICE


February 27, 2026

Panel consists of: Bailey, C.J.,
and Marion, S.C.J.[5]

Trotter, J., and Williams, J., not participating.

---

[5]Sandee B. Marion, Senior Chief Justice (Retired), Court of Appeals, 4th District of Texas at San Antonio, sitting by assignment.

At the time of submission on oral argument, Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sat on the panel by assignment. Unfortunately, he passed away before the issuance of this opinion.